Case 4:21-cv-03204 Document 31 Filed on 06/22/23 in TXSD Page 1 of 17

United States District Court
Southern District of Texas
**ENTERED**
June 22, 2023
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOLANDA ALLISON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:21-CV-03204 |
| | § | |
| LYONDELL CHEMICAL COMPANY, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

Before the Court is the defendant's, Lyondell Chemical Company ("Lyondell"), motion for summary judgment (DE 19). The plaintiff, Jolanda Allison, has responded to the motion (DE 23). Lyondell has filed a reply (DE 24) and a motion to strike the plaintiff's summary judgment evidence (DE 25).[1] After reviewing the motions, the response, the reply, the pleadings, the record, and the applicable law, the Court determines that the motion for summary judgment should be **GRANTED**.

---

[1] Because the Court grants the defendant's motion for summary judgment, the defendant's motion to strike is moot.

## II. FACTUAL BACKGROUND

This is an employment discrimination case. In 2015, Jolanda Allison began working at Lyondell as an engineer. In 2018, she transferred to Lyondell's Bayport facility to work as a principal environmental engineer. There were no other female African American principal environmental engineers at the Bayport facility. Both at Bayport and her previous facility, Allison received positive performance reviews and was a productive employee generally.

In 2019, Allison applied for an internal environmental manager position. The position instead went to outside-hire Gerald Crawford, an African American man. Crawford thus became Allison's manager. It did not take long before friction arose between Allison and Crawford. In December of 2019, Allison met with Chris Patel—a health, safety, & environmental manager—to express concerns with Crawford's leadership and request assistance with her workload. Allison noted that fellow engineers Derek Rodricks and Robert Vogle had smaller workloads than her and received assistance from other employees (unlike Allison). She did not bring up the issues of race, sex, or discrimination at this meeting. Patel told Allison that he would speak with Crawford and follow up with her. The parties dispute whether Crawford ever offered Allison assistance with her workload.

2 / 17

Soon after her meeting with Patel, Allison received her 2019 performance review. Crawford rated Allison as meeting expectations for all of her goals except one, for which he rated her as exceeding expectations. Regarding competencies, Crawford rated Allison as meeting expectations in all categories except "building effective teams," "ensures accountability," and "collaborates," for which he rated her "needs development." Crawford opined that Allison "needs to work on positively working within the team even when an opinion may be different than hers." Crawford had noticed Allison would sometimes get angry when he or her colleagues did not agree with her. Neither Crawford nor Allison found discussions about these instances productive.

A subsequent meeting between Allison and Crawford to discuss Allison's disappointment in the review fared no better. Crawford was late to arrive and ended the meeting early, but Allison later reported that the meeting ended early because discussions broke down. Afterward, Allison asked Patel to change what she deemed "misrepresentations" on her performance review. She also emailed Bayport human resources manager Steve Higgins and human resources consultant Rachel Brown about altering the review.

In response, Brown began investigating Allison's complaint about Crawford. Brown discovered numerous complaints about Allison's behavior from Crawford and other employees. Several employees reported Allison's open

disrespect toward Crawford during group settings, sometimes "derailing" or walking out of meetings after disagreements. One employee opined that Allison had "difficulty playing with others [because] it's her way or no way." Another said that she "tried to make [ Crawford] look bad." As for Crawford, several employees reported that he was unprepared for meetings, took too long to respond to emails, and did not always hold people accountable. Brown concluded that Crawford's evaluation of Allison was appropriate, that Patel should continue offering feedback to Crawford, and that Allison needed to improve her behavior or else corrective action would be necessary.

Allison continued discussing her desire to change her performance review with Brown and Patel. They told her that although they would listen to her disagreements, they could not change the review. Allison did not complain of any discrimination throughout these discussions.

Unsatisfied, Allison met with Higgins and Brown about improving her situation. Allison presented a 10-page timeline which she called a "good representation" of her concerns regarding Crawford. The timeline did not include any concerns of discrimination or retaliation. During the three and a half hour meeting, Higgins told Allison that they reviewed her complaints and the results of Brown's investigation, and that they did not determine Crawford treated her improperly. Recognizing Allison's dissatisfaction with the meeting,

Higgins suggested bringing in a third party to review the issues. Allison agreed.

Minutes after the meeting ended, Allison told Higgins and Brown that she was taking medical leave, effective immediately. The next day, Allison filed an internal "EthicsPoint" complaint accusing Crawford, Higgins, and Patel of "harassment, retaliation, targeting and creating a hostile work environment." The complaint did not mention discrimination, race, or sex. Lyondell subsequently assigned human resources business partner Anissa Walker to investigate the EthicsPoint complaint. During this investigation, multiple witnesses described insubordinate behavior from Allison, including telling her colleagues that Crawford was incompetent and less qualified than she; trying to make Crawford look bad; and generally making "it very difficult to work together." (DE 19, Exh. C-7).

When Allison returned from medical leave, she made additional complaints about Crawford to Higgins and Brown. Walker concluded from her investigation that Allison was the source of the ongoing problems and that she had not been targeted or mistreated. Determining that Allison's behavior did not comply with Lyondell's policy, Walker recommended that Allison receive a Decision Making Leave "with strong emphasis on her current unacceptable insubordinate and disruptive behavior, advising her that such behavior . . . if

continued, [will incur] further disciplinary action . . . up to and including termination." A Decision Making Leave ("DML") is "a form of paid suspension at Lyondell that requires employees to accept accountability for their behavior and commit to improvement in the future, or else forfeit their jobs and resign from the Company." Lyondell's policy is to read the DML aloud to the disciplined employee, who must then handwrite a response.

Allison met with Higgins, Patel, and Walker on January 6, 2021 to discuss her EthicsPoint complaint. Walker told Allison that her complaint was not substantiated and told her she was being issued a DML. Patel proceeded to read the DML aloud to Allison, who afterward received a copy of the document to read herself. The Lyondell managers then told Allison that she must provide a handwritten response within 48 hours accepting responsibility for her actions and committing to improving. They also told Allison that Lyondell would take her failure to do so as a resignation.

Two days later, Allison met Higgins, Patel, and Walker again. Allison presented a detailed typed-out response and more than 100 pages of documents denying all wrongdoing. During the meeting, Higgins noticed an email that Allison's lawyer had sent during or shortly before the meeting. Higgins ended the meeting and escorted Allison off the premises. Lyondell determined that Allison had not complied with the DML, and on January 14, 2021, Higgins

confirmed her employment was ending. Crawford replaced Allison with Carlisa Navy, an African American woman.

Allison has exhausted her administrative remedies through the Equal Employment Opportunity Commission, which has provided her with a Right to Sue letter. Allison sued Lyondell under Title VII for race and sex discrimination, as well as retaliation.

## III.   CONTENTIONS OF THE PARTIES

The defendant, Lyondell, contends that it is entitled to summary judgment on each of the plaintiff's three claims. First, Lyondell argues that the plaintiff cannot establish a prima facie case of discrimination under *McDonnell Douglas* because she cannot show that she suffered an adverse employment action or was treated less favorably than her similarly situated colleagues. Lyondell asserts that the plaintiff's employment ended because she did not follow instructions for a Decision Making Leave suspension. Furthermore, Lyondell contends, the plaintiff cannot show her colleagues were treated more favorably because she cannot show that any colleagues were similarly situated. Lyondell also maintains that the plaintiff cannot satisfy the prima facie elements of her retaliation claim because she never engaged in protected activity. Finally, Lyondell insists that Allison cannot show a causal link between any protected activity and any adverse action.

The plaintiff responds that Lyondell committed an adverse employment action by terminating her employment. As for similarly situated colleagues, the plaintiff argues that at least two white male colleagues were treated better than she despite their inferior performance. The plaintiff also maintains that she has established a prima facie case for retaliation because she was fired shortly after she complained about her treatment to management. The plaintiff maintains that she engaged in protected activity by alerting Lyondell to discriminatory practices. Finally, the plaintiff argues that Lyondell's reasons for its adverse actions are pretextual, and if not for her race and sex, she would have been treated differently.

## IV.  STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure authorizes summary judgment against a party who fails to meet its burden to show the existence of an essential element of its case. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment is appropriate where the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A fact is material only if its resolution would affect the outcome of the action . . . and an issue is genuine only 'if the evidence is sufficient for a reasonable jury

to return a verdict for the nonmoving party.'" *Wiley v. State Farm Fire and Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009) (internal citations omitted) (quoting *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000)). When determining whether a genuine issue of material fact exists, the court must construe "all facts and inferences . . . in the light most favorable to the nonmoving party." *Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 568 (5th Cir. 2003).

The movant bears the initial burden of "informing the Court of the basis of its motion" and identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. If the movant meets its burden, the burden shifts to the nonmovant to "set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *American Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Intern.*, 343 F.3d 401, 405 (5th Cir. 2003).

## V. ANALYSIS & DISCUSSION

### A. Title VII Discrimination and McDonnell Douglas Framework

Title VII prohibits adverse actions against employees due to their race. 42 U.S.C. § 2000e–2(a)(1). An employer's action is unlawful if the employee can demonstrate that her race or sex was "a motivating factor" for her firing, even if the employer was also motivated by other lawful factors. *Id.* § 2000e–2(m).

It is undisputed that there is no direct evidence of discrimination in this case. In such cases, the Court uses the burden-shifting *McDonnell Douglas* approach. *Watkins v. Tegre*, 997 F.3d 275, 281 (2021). *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this approach, the plaintiff must first make a prima facie case of racial discrimination. *Davis v. Dall. Area Rapid Transit*, 383 F.3d 309, 317 (5th Cir. 2004). If the plaintiff makes this case, the defendant must articulate a legitimate, non-discriminatory reason for its actions. *Id*. If the defendant does so, the presumption of discrimination disappears. *Id*. Then the employee must offer sufficient evidence to create a genuine issue of material fact that the defendant's reason is not true, but merely a pretext for discrimination. *Outley v. Luke & Assocs., Inc.* 840 F.3d 212, 216 (5th Cir. 2016).

To make a prima facie case, the plaintiff must show that (1) she is a member of a protected class, (2) she was qualified for her position at Lyondell, (3) she suffered an adverse employment action, and (4) either that she was replaced by someone outside her protected class, or that she was treated less favorably than other employees outside her protected class, under nearly identical circumstances. *McCoy v. City of Shreveport*, 492 F.3d 551, 556-557 (5th Cir. 2007).

The parties agree that the plaintiff satisfies the first two elements of her prima facie case; Lyondell does not dispute that the plaintiff is a member of a protected class or that she was qualified for her position. However, the parties dispute both whether the plaintiff suffered an adverse employment action and whether the plaintiff was treated less favorably than similarly situated coworkers. The Court analyzes both elements in turn.

*A. 1. The Plaintiff Suffered an Adverse Employment Action*

"[F]or all Title VII claims, '[a]dverse employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating.'" *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007). Although the United States Supreme Court abrogated this conception of adverse employment action regarding retaliation claims, it remains the rule for discrimination claims in the Fifth Circuit. *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006); *McCoy*, 492 F.3d at 559-560.

The plaintiff's complaints of a lack of support or large workloads do not constitute adverse employment actions. *McCoy*, 492 F.3d at 559-560. These complaints do not have the ultimacy required of an adverse action in this Circuit. Suspension without pay under the DML does not constitute an adverse action for discrimination claims, either. *McCoy* specifically held that paid

administrative leave is not an adverse employment action in a discrimination claim. *Id.*

The plaintiff's remaining complaint, discharge, may constitute an adverse employment action. *McCoy* explicitly identifies discharge as a category of adverse actions. *Id.* Lyondell argues that the plaintiff effectively discharged herself by not following the instructions laid out in the DML, which specified that diverging from the instructions would indicate her "resignation." Lyondell reasons that because the plaintiff knew that she would be discharged if she did not follow these instructions, she was not really discharged by Lyondell. But that merely makes it a *conditional discharge*. The fact that the discharge is conditioned upon certain events occurring or not occurring does not transform it into a resignation. For example, imagine an employer tells an employee that she will effectively resign if she does not improve production by 10%. She does not do so, and her employer ends her employment against the employee's will. It would be strange to say the employee resigned; she has been discharged. Perhaps the discharge is reasonable, but it is a discharge, nonetheless. And discharge constitutes an adverse employment action. Accordingly, the plaintiff satisfies this element.

*A. 2. The Plaintiff Does Not Have Appropriate Comparators*

It is undisputed that the plaintiff was replaced by a black woman, who shares both of the plaintiff's protected traits. Therefore, to satisfy the fourth element of her prima facie case, the plaintiff must show that she was treated less favorably than other employees outside her protected class, under nearly identical circumstances. *McCoy v. City of Shreveport*, 492 F.3d 551, 556-557 (5th Cir. 2007). The plaintiff has not done so.

The plaintiff offers two comparators, both of whom were white male engineers at the Bayport facility. The plaintiff alleges that she was treated worse than they were despite their inferior performance. But the comparators must be nearly identical to her *with regard to the relevant conduct*:

[C]ritically, the plaintiff's conduct that drew the adverse employment decision must have been "nearly identical" to that of the proffered comparator who allegedly drew dissimilar employment decisions. If the "difference between the plaintiff's conduct and that of those alleged to be similarly situated *accounts for* the difference in treatment received from the employer," the employees are not similarly situated for the purposes of an employment discrimination analysis.

*Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009) (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001)).

There is no evidence that either proffered comparator had the history of insubordination and undermining that Walker's investigation attributed to Allison. Allison's allegations that one of these comparators refused to perform

certain tasks—even taken as true— is not "nearly identical" to Allison's conduct: Crawford testified that he began to notice behavioral issues in 2019; Higgins opined that he viewed Allison's documents supporting her complaints against Crawford as illustrating her own insubordination and attempts to undermine Crawford; another employee reported that the plaintiff "seems to be targeting [ Crawford] during staff meetings"; another reported that she "expressed frustration and displeasure during team meetings . . . [and] has problems playing with others it's her way or no way," and another: "[ Allison] can at times during staff meetings derail meetings . . . she is not always respectful to [ Crawford]."

The DML itself declares the reasons for the plaintiff's discipline as: "a non-collaborative, disruptive and frequently disrespectful" style; "refus[al] to accept any decision, interpretation, advice, or even style on the part of [ Crawford] that deviates in any way from [her own]; her "consistent practice of resisting [ Crawford] on virtually everything"; "undermin[ing] [ Crawford] by contradicting some of his communications with client groups . . . [which was] insubordinate and undermining . . . [and giving these clients] . . . outright incorrect advice." The Court determines that the conduct for which the plaintiff was given the DML was insubordination and poor behavior, not poor performance, and her termination was the result of a refusal to accept remedial

instruction. Accordingly, the plaintiff's proffered comparators fail for lack of evidence.

The plaintiff's complaint that her proffered comparators were not investigated, while she was, also fails. The plaintiff invited this investigation into both Crawford and herself when she complained to Rachel Brown about how Crawford scored her performance review in particular areas. There is insufficient evidence that the proffered comparators complained about their manager or how their performance reviews were scored.

Because the plaintiff was replaced by someone who shares both of her protected traits and the plaintiff has not identified appropriate comparators, the plaintiff cannot satisfy the fourth element of her prima facie case. Consequently, the defendant is entitled to summary judgment on the plaintiff's race and sex discrimination claims.

*B. The Plaintiff Has Not Made Her Prima Facie Retaliation Case*

Like circumstantial discrimination claims, retaliation claims are analyzed under the *McDonnell Douglas* framework. *Hudson v. Lincare, Inc.*, 58 F.4th 222, 231 (5th Cir. 2023). The plaintiff makes a prima facie case by showing that: (1) she engaged in activity protected by Title VII; (2) she suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action. *Byers v. Dallas Morning*

*News, Inc.*, 209 F.3d 419, 427 (5th Cir. 2000). Under Title VII, an employee engages in protected activity if she has either "opposed any practice made an unlawful employment practice by this subchapter," or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

The plaintiff argues that her EthicsPoint complaint and her attorney's letter to Lyondell management both constitute protected activity. They do not. First, the EthicsPoint complaint did not mention race or sex discrimination. Nor did her ten-page timeline—which she deemed "a good representation" of the concerns she had against Crawford—or her response to the DML. Instead, her response evinced the same insubordination and refusal to cooperate that the DML attributed to her. Second, Allison's internal complaints were fully investigated by Lyondell, using a third party— Walker—with distance from the people involved. Lyondell found that her claims not only lacked merit, but indeed showed that she herself was the source of the problems. When the investigation that the plaintiff invited yielded results she did not like, she refused to cooperate with Lyondell to rectify the situation. In short, the plaintiff created this situation herself and then refused Lyondell's attempts to improve it.

The plaintiff cannot show that Lyondell retaliated against her for her attorney's letter, either. Lyondell had already issued the DML on January 6, so there can be no causal connection between the attorney's letter on January 8 and the DML. Accordingly, the plaintiff cannot make her prima facie case of retaliation.

## VI. CONCLUSION

Based on the foregoing analysis and discussion, the plaintiff cannot maker her prima facie case of discrimination or retaliation. Consequently, the defendant's motion for summary judgment is hereby **GRANTED**.

It is so ORDERED.

SIGNED on June 22, 2023, at Houston, Texas.

_____
Kenneth M. Hoyt
United States District Judge